This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:  May 19, 2016**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                              **NO. S-1-SC-35356**

**ROBERT EARLEY,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Jane Shuler Gray, District Judge**

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Steven H. Johnston, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**DANIELS, Chief Justice.**

{1} Robert Glenn Earley, convicted by a jury of first-degree murder, tampering with evidence, and kidnapping, raises eight issues on direct appeal to this Court: (1) the trial court erred by denying Defendant's motion to suppress three statements he made to law enforcement officers, (2) the trial court erred by denying Defendant's motion for a continuance, (3) the trial court erred by admitting graphic crime scene and autopsy photographs, (4) the trial court erred by limiting testimony of Defendant's pharmacology expert, (5) the trial court erred in disallowing Defendant to recall his pharmacology expert to answer the State's rebuttal testimony, (6) the trial court erred by excluding testimony of Defendant's mother about statements the victim Emily Lambert made to her, (7) evidence to support the jury's verdicts was insufficient, and (8) the trial court's errors taken together constitute cumulative error. We affirm Defendant's convictions by nonprecedential decision. *See* Rule 12-405(B) ("The appellate court may dispose of a case by nonprecedential order, decision or memorandum opinion . . . [where t]he issues presented have been previously decided . . . [, t]he presence or absence of substantial evidence disposes of the issue . . . [, or

2

t]he issues presented are manifestly without merit.").

## I. BACKGROUND

{2} Late on March 1, 2014, Defendant and his girlfriend Emily Lambert began to argue while drinking together at the Blue Cactus Lounge located within the Stevens Inn in Carlsbad, New Mexico. Lambert left the lounge angry but later returned to the hotel for her belongings and announced that she was leaving Defendant. As a result, the two started to fight again. During the argument, Lambert bit Defendant on the arm, and Defendant responded by hitting her. He then proceeded to kick Lambert several times in the face and head until she was "knocked out" but still breathing.

{3} Defendant placed the unconscious Lambert in the car and drove her behind a private residence 11.7 miles from the hotel on Potash Mines Road. Lambert was still unconscious when Defendant grabbed an air pump from the vehicle and hit her with it multiple times. He then wrapped a rope around Lambert's neck, attached the other end of the rope to his car, and dragged her behind a barn to remove her from the area in back of the house where she might be seen. Because Lambert "looked pretty bad" and appeared not to be breathing, Defendant "hit her with [a] bar a couple of times" to ensure she would not suffer or "freeze to death." Defendant then left Lambert's body and returned to his hotel room to sleep, disposing of the bar on his return route.

{4} When Defendant awoke in the morning on March 2, 2014, he returned to the

Potash Mines Road property to see if Lambert was moving, and she was not. He disposed of the rope "to cover [his] tracks." Later that morning, Defendant called 911 and reported Lambert missing, explaining to the dispatcher that Lambert never returned to the Stevens Inn after telling Defendant she was leaving the bar with another man.

**A.      The Police Investigations**

{5}      Officer David Williams responded to the 911 call on that same day in the afternoon and met with Defendant outside his Stevens Inn hotel room to take a missing persons report. Defendant recounted that he and Lambert had a verbal altercation on the prior night at the hotel lounge and that Lambert became upset and left with another man. During the interview, Officer Williams did not observe any signs that Defendant was intoxicated. The officer returned to the Stevens Inn on the next day to follow up on the case and learned that Lambert had not returned.

{6}      On the same morning, Detective Robert Scott Naylor and Sergeant Blaine Rennie of the Carlsbad Police Department were assigned to investigate the case. The two officers met with Defendant, as the original reporting party, at his hotel room. Once again, Defendant claimed that he had an argument with his girlfriend and that she left the hotel bar with another man and never returned. After speaking with Defendant, the officers requested consent to search Defendant's vehicle that was

4

parked by an oil rig on a county road approximately thirty miles from the Stevens Inn. Defendant consented to the search and provided officers with his vehicle key and directions to the vehicle.

{7} Upon returning to the hotel, the officers requested that Defendant accompany them to make a recorded statement at the police station, and he agreed. Officers transported Defendant, unrestrained, to the station because he did not have a car. At the police station, Defendant provided Rennie with a recorded statement, reiterating that he and Lambert argued at the hotel bar and that she left, but this time he said that he did not actually see her leave with another man. Rennie asked Defendant if he would be willing to take a polygraph examination on the following day, and again Defendant agreed. When the interview concluded, an officer drove Defendant back to the Stevens Inn. Officers conducted surveillance of Defendant's room overnight. Neither officer identified signs of impairment in Defendant throughout their first day of encounters with him.

{8} On the following morning, March 4, 2014, Defendant contacted Rennie to request a ride to the police station to participate in the polygraph exam. At approximately 10:00 a.m., Tim Argo of the Artesia Police Department administered a polygraph exam to Defendant at the Carlsbad Police Department. Before commencing, Argo reviewed a "Consent for Polygraph Examination" form with

Defendant. In addition to a waiver of liability for the exam itself, the form also included an advisement of the polygraph examinee's *Miranda* rights. Defendant consented to the polygraph exam and indicated that he understood his rights and wished to proceed. During an interview before the polygraph exam, Defendant responded in the negative to standard questions regarding whether he was under the influence of illicit drugs, alcohol, or prescription medication. Argo did not identify any signs of impairment in Defendant. The exam lasted several hours, at the end of which Argo informed Defendant that he had failed and that Rennie wished to speak with him.

{9} After Argo notified Rennie and Naylor that Defendant failed the polygraph exam, the officers gave Defendant a break and lunch, and then both officers returned to interview him. The officers did not repeat Defendant's *Miranda* rights prior to conducting the postpolygraph-exam interview. During this interview, Defendant provided a second version of events. This time he claimed that when Lambert left the bar she got into another man's truck and that Defendant followed her and the unidentified man in his own vehicle to a "housing . . . area." Defendant said that when he pulled up behind the other vehicle, the man came after him with a pipe and Lambert jumped in between the two men, which caused the man to hit her in the head with the pipe. Defendant stated that he got back into his vehicle and fled. When the

6

interview ceased, Defendant directed Rennie, Naylor, and another officer to the housing location on Potash Mines Road.

{10} At the residence, Defendant waited in the driveway, outside the patrol unit, while the three officers proceeded further onto the property and discovered Lambert's body. Rennie walked back to Defendant and advised him that the officers found Lambert. While the other officers secured the crime scene, Naylor transported Defendant to the Carlsbad Police Station for additional questioning. Prior to conducting the brief interview, Naylor again read Defendant his *Miranda* rights, and Defendant acknowledged that he understood those rights and agreed to speak with Naylor. Defendant repeated the version of events provided in the interview conducted in the early afternoon after the polygraph exam. The interview began at 5:49 p.m. and lasted twenty-six minutes.

{11} A short time later, at approximately 7:15 p.m., Detective Sergeant Allen Sanchez entered the interview room to further question Defendant. Sanchez did not readvise Defendant of his *Miranda* rights prior to conducting the interview, though he was aware an officer had provided Defendant with the *Miranda* warnings earlier. Sanchez did not observe any signs that Defendant was impaired during the course of conducting the interview. This time, Defendant confessed to a third version of events where during a struggle with Lambert he kicked her in the head multiple times until

7

she was unconscious, took her to the residence on Potash Mines Road, beat her with an air pump when she regained consciousness, dragged her body, and left her. Defendant then guided Sanchez and Rennie to locations where he had placed evidence of the crime. He first directed the officers to the rope and a bag with Lambert's clothes. However, because he was unable to lead officers to the air pump that evening, Defendant volunteered to help the officers locate it on the next day.

{12}     On the following morning, March 5, 2014, Sanchez retrieved Defendant from the jail, and they located the air pump that matched the description Defendant had provided. On the way back to the jail, Defendant spontaneously began giving Sanchez new information about the crime. Sanchez allowed him to speak but did not ask any questions until they returned to the jail. Outside the jail, Sanchez asked for Defendant's permission to record a statement pertaining to the new information. Sanchez again advised Defendant of his *Miranda* rights, and Defendant responded that he understood them. Defendant expounded on details he had previously provided and admitted that Lambert never regained consciousness at the Potash Mines Road property, contrary to the statement he made on the previous day that he beat Lambert again at the property when she regained consciousness and they resumed fighting.

**B.     Court Proceedings**

{13}     On March 14, 2014, the State charged Defendant with first-degree murder, first-

8

degree kidnapping, and tampering with evidence. At the conclusion of a nearly three-week jury trial, Defendant was convicted of all three charges. The jury also unanimously found that Defendant murdered Lambert with the intent to kill in the commission of the kidnapping, an aggravating circumstance for sentencing purposes under NMSA 1978, Section 31-20A-5(B) (1981). Defendant was sentenced to life imprisonment without the possibility of parole. He now appeals his convictions directly to this Court pursuant to Article VI, Section 2 of the New Mexico Constitution, which states that "[a]ppeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court." The facts relevant to the trial court's rulings challenged on appeal are developed further below.

**II. DISCUSSION**

**A. Defendant's Motion to Suppress His Statements to Law Enforcement Officials**

**{14}** Prior to trial, Defendant moved to suppress one postpolygraph-exam statement he made to law enforcement on March 4, 2014, as evidence obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and two additional statements made on the same date as fruits of the first unlawfully obtained statement. *See State v. King*, 2013-NMSC-014, ¶ 3, 300 P.3d 732 ("In *Miranda*, the United States Supreme Court

9

articulated a warning that law enforcement must give to a suspect before the suspect can be subjected to a custodial interrogation without compromising the suspect's privilege against self-incrimination." (citing *Miranda*, 384 U.S. 478-79)). Defendant primarily contended that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights prior to making his first postpolygraph-exam statement "because he was coming out from under the influence of alcohol" after "four days of continuous drinking." Following a suppression hearing, the trial court disagreed and denied the motion, finding that Defendant was not in custody until officers discovered Lambert's body on the afternoon of March 4, 2014, and was not impaired when speaking to law enforcement during periods of custodial interrogation.

{15} On appeal, Defendant abandons his argument that the first statement was involuntary based on intoxication. *See State v. Correa*, 2009-NMSC-051, ¶ 31, 147 N.M. 291, 222 P.3d 1 ("On appeal, issues not briefed are considered abandoned."). Rather, Defendant asserts the trial court erred because the first interview was custodial and unwarned, rendering the remaining statements inadmissible as fruits of the poisonous tree. To support his contention that he was in custody for *Miranda* purposes, Defendant notes that he was interviewed at the police station and "badgered by his interrogators" such that "no reasonable person would feel free to leave." Defendant does not challenge other statements that he made to law enforcement on

March 2, 3, or 5, 2014.

**{16}** "In reviewing a trial court's denial of a motion to suppress, we observe the distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (alteration in original) (internal quotation marks and citation omitted). Determining whether a police interview constitutes custodial interrogation for *Miranda* purposes requires the application of law to facts. *Id.* We therefore review the trial court's determination de novo, while giving deference to the court's factual findings. *Id.*

**1.  March 4, 2014, postpolygraph-exam statement to Sergeant Rennie and Detective Naylor**

**{17}** At issue is whether Defendant was in custody, thereby requiring a *Miranda* advisement, when Sergeant Rennie and Detective Naylor interviewed him following the failed polygraph exam. "A suspect's *Miranda* rights attach only when he is the subject of a 'custodial interrogation.'" *Nieto*, 2000-NMSC-031, ¶ 20 (citation omitted). "[W]hether or not an interview is custodial depends on whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (internal quotation marks and citation omitted). "A suspect is also considered in custody if a reasonable person would believe that he or she were not free

11

to leave." *State v. Munoz*, 1998-NMSC-048, ¶ 40, 126 N.M. 535, 972 P.2d 847. This is an objective determination, and "the actual subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Id.* (internal quotation marks and citation omitted).

{18}    In *Nieto* this Court determined that officers were not constitutionally required to advise the defendant of his *Miranda* rights prior to questioning in a murder case. *See* 2000-NMSC-031, ¶¶ 20-21. Though the defendant was questioned in the detective's small office with his back to the wall, an officer was situated between the defendant and the doorway, and the office door was closed, the Court determined that these factors alone did not indicate that the "[d]efendant's freedom of movement was restricted to an extent consistent with a formal arrest." *Id.* ¶ 21. Rather, those facts combined with the trial court's findings that the defendant agreed to accompany officers to the police station when asked, that he was free to leave or terminate the interview, and that he was provided with transportation to and from the police station were "consistent with routine, non-custodial police questioning." *Id.* As a result, this Court affirmed the trial court's ruling that the interview was noncustodial and that *Miranda* warnings were unnecessary. *See id.*

{19}    In the present case, a number of facts could support Defendant's contention that he was in custody during the postpolygraph-exam interview: Defendant was

questioned at the police station, the interview lasted several hours, and Defendant was escorted by an officer at all times while at the police station. *See Munoz*, 1998-NMSC-048, ¶¶ 42-43 (recognizing that the location and duration of the interrogation, as well as the fact that the defendant was the focus of the police investigation, could support a conclusion that the defendant was in custody but concluding that additional evidence in the record failed to demonstrate the defendant's freedom as restricted in any way associated with formal arrest to constitute custody for *Miranda* purposes).

{20}     In this case as well, additional evidence presented at the suppression hearing supports the trial court's ultimate determination that Defendant was not in custody during the postpolygraph-exam interview. Defendant initiated contact with police officers by filing a missing persons report. Officers then asked Defendant to participate in a polygraph exam at the police station, and he agreed to do so. On the morning of the exam, Defendant called Rennie's cell phone to request a ride to the police station for the exam because he did not have a vehicle, and the officer responded by providing transportation for Defendant. During the postpolygraph-exam interview, officers provided Defendant with food, and Defendant took cigarette and bathroom breaks at will. An officer escorted Defendant during these breaks, in part to open the hallway door that automatically locked upon entering the bathroom. Officers did not block access to the door of the interview room. Rennie and Naylor

13

testified that Defendant was free to leave at the time of the postpolygraph-exam interview. Defendant was not physically restrained at any time during the interview, his freedom of movement was not restricted in any significant way, and a review of the record does not reveal evidence that the officers' interview method or the interview environment was unduly coercive. *See State v. Chamberlain*, 1991-NMSC-094, ¶ 17, 112 N.M. 723, 819 P.2d 673 (noting that *Miranda* warnings are not required "every time the police interview a suspect, even though there may be coercive aspects to the questioning; a coercive environment requiring warnings occurs only where there has been such a restriction on a person's freedom as to render him *in custody*." (emphasis added) (internal quotation marks and citation omitted)); *State v. Swise*, 1983-NMSC-071, ¶ 12, 100 N.M. 256, 669 P.2d 732 (concluding that the defendant was not in custody for *Miranda* purposes and noting that evidence "reflect[ed] no coercive atmosphere against which *Miranda* was developed to protect"). As in *Nieto*, these facts are indicative of routine, noncustodial police questioning. We affirm the trial court's ruling that the May 4, 2014, postpolygraph-exam interview at the police station was noncustodial and that the officers were not constitutionally required to provide Defendant with *Miranda* warnings.

**2.      March 4, 2014, statements to Detective Naylor and Detective Sanchez**

{21}      Defendant claims the statements he made to Detective Naylor and Detective

14

Sanchez later on March 4, 2014, following the discovery of Lambert's body at the Potash Mines Road property must be suppressed as fruits of the first postpolygraph-exam statement he alleges to have been unlawfully procured. Because we conclude that the trial court did not err by admitting Defendant's first postpolygraph-exam statement, Defendant's argument fails. Moreover, Naylor again read Defendant his *Miranda* rights prior to questioning him at 5:49 p.m. Defendant acknowledged that he understood his rights and agreed to speak with Naylor. A short time later, Detective Sanchez entered the interview room to continue questioning Defendant on the same matter, but he did not readvise Defendant of his *Miranda* rights.

{22}     "A confession is not necessarily invalid because [*Miranda*] warnings . . . were not given in full each time the interrogation process was resumed after interruption." *State v. Gilbert* (*Gilbert I*), 1982-NMSC-095, ¶ 12, 98 N.M. 530, 650 P.2d 814. In *Gilbert I*, this Court held that officers were not required to provide the defendant with "a second fresh and full *Miranda* warning" prior to a second interrogation when he had been advised of these rights twice that same day, "as recently as four hours before," and when he expressed that he understood those rights. *Id.*

{23}     In this case, Defendant's statements to Sanchez a short time after he was questioned by Naylor were not rendered inadmissible by Sanchez's failure to separately advise Defendant of his *Miranda* rights before continuing the questioning.

15

Defendant already had been advised of his rights prior to the polygraph exam at approximately 10:00 a.m. and again when Naylor interviewed him at 5:49 p.m. Following each set of warnings, Defendant indicated that he understood his rights and wished to proceed. After Naylor completed his brief twenty-six minute interview, Sanchez resumed questioning an hour later at approximately 7:15 p.m. The character of the interrogation did not change; Sanchez entered the interview room soon after Naylor and questioned Defendant in the same manner and on the same matter. Accordingly, we conclude that the trial court did not err by admitting Defendant's March 4, 2014, statements into evidence.

**B.       Defendant's Motion for a Continuance**

**{24}**       Defendant claims that the trial court erred by refusing to grant his motion for a continuance. "The grant or denial of a continuance is within the sound discretion of the trial court, and the burden of establishing abuse of discretion rests with the defendant." *State v. Salazar*, 2007-NMSC-004, ¶ 10, 141 N.M. 148, 152 P.3d 135; *see also State v. Smith*, 1979-NMSC-020, ¶ 13, 92 N.M. 533, 591 P.2d 664 ("The standard of review on a denial for a motion for continuance is whether the trial court abused its discretion to the prejudice or injury of the defendant."). When evaluating a trial court decision granting or denying a motion for continuance we look to a number of factors including

16

"the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the prejudice to the movant in denying the motion."

*State v. Gallegos*, 2011-NMSC-027, ¶ 66, 149 N.M. 704, 254 P.3d 655 (quoting *State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20).

{25} In applying these factors to the present case, we conclude that the trial court did not abuse its discretion in its ruling on Defendant's motion for a continuance. On January 29, 2015, Defendant moved to continue the trial then scheduled for March 16, 2015. In the motion and at a hearing on the matter, defense counsel requested that the court continue trial to August 2015, noting several reasons for the request including more time to accommodate defense counsels' overloaded schedules, more time to allow newly assigned counsel acting as second chair to prepare for trial, more time to ascertain the proper procedures in a case with a potential sentence of life imprisonment without parole, more time to finalize supplemental jury questionnaires, and time to resolve several discovery matters. On appeal, Defendant asserts that the request had a sound basis and posed no inconvenience. Defendant does not articulate the prejudice that resulted from the trial court's denial of his motion.

{26} The record indicates that any concerns pertaining to discovery were resolved

17

at the hearing on the motion for continuance. At the same hearing, former defense counsel also testified pertaining to case information that she transferred to new counsel when she left the Office of the Public Defender, stating that counsel serving as first chair was originally her second chair and was at all times privy to case-related information. She stated that the case was on schedule to move to trial when she left on December 26, 2014. The trial court noted it had initially set trial for January 2015 and then moved the setting to March 2015 to accommodate a request from defense counsel. The court did not believe it had another available setting for a year and expressed concern that Defendant would remain incarcerated during that time. Importantly, the trial court did not wholly deny Defendant's request but rather granted a partial continuance to accommodate defense counsels' schedules and workloads by moving the trial from the middle of March to the end of April. In this case, there is no showing that the trial court's decision prejudiced Defendant, and the record reveals that the trial court did not abuse its discretion. Accordingly, we uphold the trial court's ruling.

**C.      Admission of Certain Crime Scene and Autopsy Photographs**

{27}      Defendant asserts that the trial court improperly admitted six graphic autopsy photographs of Lambert, claiming they were redundant and irrelevant and should have been excluded because the danger that the photographs would unfairly prejudice

Defendant substantially outweighed their probative value. For similar reasons, Defendant also asserts that the trial court improperly admitted twelve crime scene photographs.

{28} "We review a trial court's exercise of discretion in admitting allegedly prejudicial photographs under an abuse of discretion standard." *State v. Saiz*, 2008-NMSC-048, ¶ 53, 144 N.M. 663, 191 P.3d 521, *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 & n.1, 146 N.M. 357, 210 P.3d 783. "Photographs are relevant and admissible for the purpose of clarifying and illustrating testimony." *State v. Gilbert* (*Gilbert II*), 1983-NMSC-083, ¶ 43, 100 N.M. 392, 671 P.2d 640. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Rule 11-403 NMRA.

{29} In this case, the contested photographs were relevant to the State's case at trial. The physician-employee of the Office of the Medical Investigator who processed Lambert's autopsy referred to the photographs in his medical testimony to establish Lambert's cause and manner of death. He also relied on photographs showing portions of Lambert's body with redness in her abrasions to demonstrate that Lambert was still alive when Defendant brought her to the Potash Mines property and dragged her behind the barn. Additionally, the State offered the disputed crime scene photographs as relevant to reconstruction of the crime scene, in conjunction with testimony from

the officer who managed the crime scene investigation and reconstruction team.

**{30}** The admitted photographs were not unduly prejudicial to Defendant. The trial court held hearings, outside the jury's presence, on defense counsel's objections to the photographs. Prior to trial, the State voluntarily cropped certain photographs and omitted others to reduce potentially inflammatory effects. The trial court further requested that the State crop portions of some of the remaining contested photographs and, in one instance, excluded a photograph. The trial court proceeded cautiously by holding hearings outside the jury's presence and reviewing each disputed photograph both for relevance and for potential prejudice. *See Saiz*, 2008-NMSC-048, ¶ 54 (concluding that a trial court did not abuse its discretion in admitting probative graphic photographs of the victim's body because the trial judge "proceeded cautiously and prudently" by considering the basis for the Rule 11-403 decision outside the jury's presence and by carefully selecting some photographs to admit while excluding others). We conclude that the trial court did not abuse its discretion by admitting the contested autopsy and crime scene photographs.

**D.      Limitation on the Testimony of Defendant's Pharmacology Expert**

**{31}** Defendant next contends that the trial court erred in restricting the testimony of defense expert Dr. Jose O. Rivera. Defendant's entire defense rested on his claim of voluntary intoxication and subsequent inability to form the specific intent required

20

to sustain a first-degree murder conviction. Defendant proffered Dr. Rivera's testimony to demonstrate the effects of alcohol consumption and energy drinks on a person given a number of variables such as person's "age, weight, speed of drinking, and whether any food was consumed." Defendant also sought to solicit Dr. Rivera's opinion, through a series of hypothetical fact patterns based on the underlying circumstances of this case, regarding Defendant's possible blood alcohol concentration (BAC) and ability to plan and weigh consequences on the night of the homicide.

{32} The day before trial, the State filed a *Daubert* motion to exclude Dr. Rivera's testimony in its entirety, arguing in relevant part that Dr. Rivera's opinions were based on assumptions and insufficient facts and were therefore "speculative and conjectural." The trial court initially addressed the matter in a pretrial hearing on April 29, 2015, but did not rule at that time, preferring instead to hear from Dr. Rivera himself prior to allowing or limiting his testimony for the jury. Accordingly, prior to Dr. Rivera's testimony, the trial court qualified him as an expert and found his methodology reliable but expressed its concern that the factual foundation for his testimony was highly subjective as to the amount of alcohol Defendant actually consumed. As a result, the trial court limited Dr. Rivera's testimony to the effects of alcohol consumption on a hypothetical person of a similar height, weight, and age as

21

Defendant if that hypothetical person consumed what Defendant claimed he consumed. The trial court limited the State's rebuttal expert similarly.

{33}     We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *State v. Guerra*, 2012-NMSC-014, ¶ 36, 278 P.3d 1031; *see also State v. Downey*, 2008-NMSC-061, ¶ 24, 145 N.M. 232, 195 P.3d 1244 ("An abuse of discretion arises when the evidentiary ruling is clearly contrary to logic and the facts and circumstances of the case." (internal quotation marks and citation omitted)). We assume without deciding that the trial court properly qualified Dr. Rivera as an expert witness and that the methodology this expert utilized for calculating BAC was valid. The narrow question before this Court, then, is whether the trial court abused its discretion by limiting Dr. Rivera's testimony based on concerns that the factual basis for the testimony was deficient as to what Defendant himself ingested on the night in question.

{34}     Rule 11-702 NMRA governs the admission of expert testimony or other scientific evidence. "[F]or scientific evidence to be admissible under Rule 11-702, the reasoning or methodology underlying the testimony [must not only be] scientifically valid, it also must be *properly . . . applied to the facts in issue*." *Downey*, 2008-NMSC-061, ¶ 30 (second alteration in original) (internal quotation marks and citation omitted). "Expert testimony may be received if, and only if, the expert possesses such

22

facts as would enable him to express a reasonably accurate conclusion as distinguished from mere conjecture." *Id.* ¶ 32 (internal quotation marks and citation omitted). "Experts may, and often do, base their opinions upon factual assumptions, but those assumptions in turn must find evidentiary foundation in the record." *Id.* ¶ 34.

{35}     In *Downey*, this Court concluded that the trial court improperly admitted the state's expert testimony utilizing retrograde extrapolation because the extrapolation was "predicated on factual assumptions unsupported by the record." *Id.* ¶¶ 1, 13 ("[R]etrograde extrapolation . . . calculates an individual's prior BAC level on the basis of a subsequently administered BAC test."). The state in that case failed to produce evidence, even circumstantial evidence, regarding when the defendant last consumed alcohol or how much alcohol the defendant consumed, rendering the expert's underlying assumptions "mere guesswork" and the conclusions "mere conjecture." *Id.* ¶¶ 34, 36.

{36}     In contrast, this Court determined in *State v. Hughey* that the expert witness possessed sufficient facts in support of the conclusion that the defendant was at her peak alcohol level at the time the accident occurred to then accurately apply retrograde extrapolation. *See* 2007-NMSC-036, ¶ 15, 142 N.M. 83, 163 P.3d 470; *see also Downey*, 2008-NMSC-061, ¶ 37 (distinguishing *Hughey*). The expert testified about the generally accepted time for an individual to reach a peak alcohol level and then,

"working from the assumption that [the d]efendant stopped drinking at 8:30 p.m., as she told police," concluded as to when the defendant likely reached her peak alcohol level. *Hughey*, 2007-NMSC-036, ¶ 15.

{37}    In this case, Defendant and the State presented conflicting circumstantial evidence surrounding Defendant's alcohol consumption and level of intoxication. The evidence included witness testimony from employees and patrons of the Blue Cactus Lounge, officers who interviewed and interacted with Defendant, and Defendant's own videotaped statements. The parties also stipulated to the admission of restaurant receipts detailing alcohol Defendant and Lambert purchased on the night of the homicide, and the State introduced receipts similarly detailing alcohol purchased specifically from the Blue Cactus Lounge. Dr. Rivera testified that he reviewed transcripts and videos as the basis for his expert opinion testimony but did not indicate, nor does the record show, that he examined or interviewed Defendant, reviewed Defendant's history of alcohol use, or reviewed Defendant's medical records. Unlike in *Downey* and *Hughey*, here there was no BAC determination for Defendant at any time from which an expert could extrapolate a more accurate BAC estimate pertinent to the time the homicide occurred.

{38}    Given that Dr. Rivera, like the expert in *Downey*, did not have the facts necessary to speak specifically to Defendant's level of intoxication on the night of the

homicide, the trial court did not abuse its discretion in limiting his testimony to the effects of alcohol on a hypothetical person bearing the same characteristics as Defendant under the circumstances of this case. To be certain, the trial court could have allowed Dr. Rivera to testify, as the expert in *Hughey* did, that he was working from the assumption that the facts were as Defendant reported them. Nevertheless, through Dr. Rivera's testimony, Defendant was able to present the same information: that if a male sharing Defendant's characteristics consumed the number and type of drinks Defendant claimed he consumed over a twelve-hour period, he would have a BAC of at least 0.35 milligrams in 100 milliliters of blood at the time of the murder. Dr. Rivera opined that at that level, such a person would be severely impaired and unable to plan and properly weigh the consequences of his actions. Defendant does not state how he was prejudiced by the hypothetical framing of the testimony under an assumption of the facts as Defendant perceived them, nor does the record reflect that Defendant was prejudiced in any way by the trial court's ruling. Given defense counsel's statement in opening argument that Dr. Rivera would testify about the effects of alcohol on a "person who has the height and weight of Robert Earley" and the evidence both parties presented to the jury throughout the trial pertaining to Defendant's alcohol use and consumption, a reasonable jury could easily make the inference from the hypothetical person to Defendant. Accordingly, the trial court did

25

not abuse its discretion in limiting Dr. Rivera's testimony.

**E.       Denial of Defendant's Motion to Allow Testimony in Answer to the State's Rebuttal Testimony**

{39}     "[W]hat shall be permitted to go to the jury as rebuttal testimony is a matter entirely within the discretion of the trial court, and this discretion will not be disturbed except for gross abuse." *State v. Johnson*, 1983-NMSC-043, ¶ 27, 99 N.M. 682, 662 P.2d 1349 (alteration in original) (internal quotation marks and citation omitted). A review of the record indicates that the trial court did not abuse its discretion in disallowing Defendant from recalling Dr. Rivera at the conclusion of the rebuttal testimony of State expert Dr. Hwang.

{40}     Defendant sought to answer the rebuttal with expert testimony to challenge the narrow issue of the rate of alcohol metabolism Dr. Hwang chose to use in his calculations. Prior to Dr. Rivera's testimony, Defendant learned of the difference in the two experts' opinions regarding the rate at which the body metabolizes alcohol. The trial court therefore allowed Dr. Rivera to testify in the case in chief that the metabolism rate Dr. Hwang utilized was unsupported by the scientific literature, leaving open the possibility that if Dr. Hwang presented unexpected testimony, defense counsel could address the matter at that time. Dr. Rivera did testify that experts in his field would not use the maximum metabolism rate that Dr. Hwang used

as a standard, a rate he characterized as "extreme." In addition, defense counsel cross-examined Dr. Hwang on this issue. Consequently, Defendant was not denied the opportunity to introduce Dr. Rivera's testimony, and any further testimony in answer to the State's rebuttal would have been merely confirmatory. *See State v. Doe*, 1983-NMCA-012, ¶¶ 10-11, 99 N.M. 456, 659 P.2d 908 ("If evidence sought to be introduced [in answer to the State's rebuttal witness] is . . . merely cumulative or confirmatory, its admission is within the discretion of the trial court."). We hold the trial court properly exercised its discretion.

**F.       Exclusion of Testimony Concerning Lambert's Statement to Defendant's Mother**

{41}      Defendant sought to introduce testimony of his mother, Donna Earley, that Lambert previously told her that Lambert and her ex-husband "had frequent domestic issues that turned physical" and that she was proud of "putt[ing] [him] down on the ground." Defendant claimed Lambert's comments were relevant and admissible to illustrate Defendant's state of mind on the night Lambert was murdered. Defendant further argued that the State had placed Lambert's character into evidence, thereby opening the door for Defendant to counter that information. He claimed the statements were admissible under an exception to the hearsay rule as statements against Lambert's interest. The trial court disagreed and prohibited Ms. Earley's testimony

27

about Lambert's statements as impermissible hearsay and irrelevant to Defendant's claims that he lacked the specific intent for first-degree murder.

{42}     We examine the admission or exclusion of evidence for abuse of discretion. *See State v. Flores*, 2010-NMSC-002, ¶ 25, 147 N.M. 542, 226 P.3d 641. Pursuant to Rule 11-404(A)(1) NMRA, generally "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." In criminal cases, however, an exception exists that allows a defendant to offer "evidence of a victim's pertinent trait" for the purpose of proving that the victim acted in conformity with that trait on a particular occasion. Rule 11-404(A)(2)(b). Rule 11-405(B) NMRA concerns methods for proving character and provides that in cases in which "a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of [the person's] conduct," in addition to proof in the form of reputation or opinion testimony. For example, "[w]hen a defendant is claiming self-defense, his or her apprehension of the victim is an essential element of his or her claim," and consequently, "under Rule 11-405(B), evidence of specific instances of the victim's prior violent conduct of which the defendant was aware may be admitted to show the defendant's fear of the victim." *State v. Armendariz*, 2006-NMSC-036, ¶ 17, 140 N.M. 182, 141 P.3d 526, *overruled on other grounds by State v. Swick*,

28

2012-NMSC-018, ¶ 31, 279 P.3d 747. Here, Defendant has not raised a theory of self-defense, and Lambert's character is not an essential element of Defendant's voluntary-intoxication defense. The trial court correctly ruled that testimony pertaining to Lambert's statement was irrelevant to Defendant's claims.

{43}    Moreover, Lambert's statement to Ms. Earley is inadmissible hearsay. Hearsay is an out-of-court statement that is later "offer[ed] in evidence to prove the truth of the matter asserted." Rule 11-801(C) NMRA. "The hearsay rule excludes from admissible evidence statements that are inherently untrustworthy because of the risk of misperception, failed memory, insincerity, ambiguity, and the like." *State v. Mendez*, 2010-NMSC-044, ¶ 19, 148 N.M. 761, 242 P.3d 328. Nevertheless, our rules of evidence provide exceptions to the inadmissibility of hearsay. *See* Rule 11-802 NMRA. One such exception is Rule 11-804(B)(3) NMRA, which provides that the rule against hearsay does not exclude a statement against the declarant's interest if the declarant is unavailable. A statement against interest is defined as a "statement . . . [that] was so contrary to the declarant's proprietary or pecuniary interest or [that] had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." *Id.* This exception has no application here. There is no evidence that Lambert's alleged statement was against any proprietary or pecuniary interest, nor would the statement have exposed Lambert

29

to civil or criminal liability. Importantly, the record is devoid of "circumstantial guarantees of reliability sufficient to make the statement[] trustworthy and admissible." *Mendez*, 2010-NMSC-044, ¶ 19. Consistent with Rule 11-804(B)(3), the trial court properly rejected Defendant's argument.

**G.      Sufficiency of Evidence to Support Defendant's Convictions**

{44}     In reviewing the sufficiency of the evidence, we consider the evidence "in the light most favorable to the State, resolving all conflicts and making all permissible inferences in favor of the jury's verdict." *Id.* ¶ 42 (internal quotation marks and citation omitted). The test for sufficiency of the evidence is whether substantial evidence exists that would allow a rational jury to find each element of the crime established beyond a reasonable doubt. *See Id.*

**1.      Sufficient evidence supports Defendant's deliberate intent to commit first-degree murder**

{45}     Defendant argues that this Court should reverse his conviction for first-degree murder because there was insufficient evidence to support deliberate intent to commit murder as opposed to the killing being the result of a rash impulse. To establish first-degree deliberate murder, the State was required to prove beyond a reasonable doubt that Defendant killed Lambert with the deliberate intention to take away her life and that he was not intoxicated to the extent of being incapable of forming this intent. *See*

30

NMSA 1978, § 30-2-1(A)(1) (1994) ("Murder in the first degree is the killing of one human being by another . . . by any kind of willful, deliberate and premeditated killing."); UJI 14-201 NMRA ("The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action," and "a deliberate intention to kill" requires a "calculated judgment" to kill, although it "may be arrived at in a short period of time."). "[I]f the State merely proves that the accused acted rashly or impulsively, rather than deliberately, and if the accused acted intentionally and without justification or provocation, then the facts would only support second-degree murder." *State v. Adonis*, 2008-NMSC-059, ¶ 16, 145 N.M. 102, 194 P.3d 717.

{46}    Defendant relies on *State v. Garcia*, 1992-NMSC-048, 114 N.M. 269, 837 P.2d 862, to argue there was insufficient evidence to prove the requisite mens rea beyond a reasonable doubt to sustain a conviction for deliberate-intent, first-degree murder. In *Garcia*, this Court held that not only was evidence insufficient to support an inference of deliberate intention in the stabbing death of the victim but that "[t]here was no evidence to support the jury's conclusion that . . . [the defendant] decided to stab [the victim] as a result of careful thought; that he weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against this choice." *Id.* ¶ 28. The state's

31

evidence demonstrating that the defendant and the victim argued, reconciled, and argued again, ultimately resulting in the defendant stabbing the victim to death, was "consistent with a rash and impulsive killing" rather than a deliberate killing. *See id.*

{47} The circumstances of this case are vastly distinct from those of *Garcia*, and this Court has concluded there was sufficient evidence for a rational jury to infer deliberate intent under factual circumstances similar to those here. For example, in *State v. Duran*, this Court concluded that a reasonable jury could infer deliberate intent based on evidence of a prolonged struggle, the large number of the victim's wounds, and the defendant's own statements. *See* 2006-NMSC-035, ¶¶ 9, 11, 140 N.M. 94, 140 P.2d 515; *see also State v. Astorga*, 2015-NMSC-007, ¶ 65, 343 P.3d 1245 (concluding that the jury could have found that evidence of the defendant's actions, including his own statements after the killing, aided in proving deliberate intention); *Flores*, 2010-NMSC-002, ¶ 22 (concluding that there was sufficient evidence of deliberate intent where the defendant stabbed the victim with a screwdriver "so many times that it evidenced an effort at overkill"); *State v. Cunningham*, 2000-NMSC-009, ¶ 28, 128 N.M. 711, 998 P.3d 176 (concluding that evidence of the defendant returning to his vehicle to fire the fatal shot when the victim was incapacitated and defenseless could support a reasonable juror's inference of deliberation). Further, "[n]ot only may Defendant's acts before and during the crime provide evidence of intent, [but]

evidence of flight or an attempt to deceive the police may prove consciousness of guilt." *Flores*, 2010-NMSC-002, ¶ 23 (internal quotation marks and citation omitted).

{48} In this case, the State presented substantial evidence at trial to raise a reasonable inference of deliberate intent. The jury could have found that Defendant (1) was upset by Lambert's threats to leave following their argument, (2) rendered Lambert unconscious with multiple kicks to the head, (3) placed Lambert, unconscious and defenseless but still alive, in the vehicle and drove her to the more remote location 11.7 miles from the hotel to finish killing her, (4) beat Lambert severely with an air pump causing the plastic to splinter and break, (5) affixed one end of a rope to his car and another to Lambert's neck to drag her out of sight behind the barn, (6) then proceeded, by his own admission, to beat Lambert to death with a "bar," (7) left the scene of the incident, (8) began getting rid of the evidence as he drove away, (9) returned the following morning to check on Lambert's body, and (10) tried to deceive authorities by filing a missing persons report and then providing several different stories about what happened on the night in question.

{49} The complexity of these extended activities also belies Defendant's contention that he could not have formed specific intent due to voluntary intoxication. The jury also heard evidence from both parties regarding Defendant's level of intoxication on the night of the homicide and was free to reject Defendant's version of the facts. *See*

33

*State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314 (noting that "[t]he fact finder may reject defendant's version of the incident"). Reviewing the evidence in the light most favorable to the guilty verdict, we hold that there was sufficient evidence to support the jury's conclusion that Defendant killed Lambert with the requisite deliberate intent to support a first-degree murder conviction.

**2.      Sufficient evidence supports Defendant's kidnapping conviction**

{50}     To support a kidnapping conviction under New Mexico law, the State must prove an "unlawful taking, restraining, transporting or confining of a person by force, intimidation or deception, with intent . . . to inflict death, physical injury or a sexual offense." NMSA 1978, § 30-4-1(A)(4) (2003); *see also* UJI 14-403 NMRA. Relying on *State v. Jacobs*, 2000-NMSC-026, 129 N.M. 448, 10 P.3d 127, for the proposition that the State "must show that the defendant's actual purpose was different from the reason the defendant and alleged victim voluntarily associated with each other," Defendant claims the State failed to meet its burden. This argument is entirely without merit.

{51}     The jury could have inferred from the State's evidence that any voluntary association between Defendant and Lambert ceased in the hotel room when the couple began arguing and Defendant administered several blows to Lambert's head, knocking her unconscious. *See State v. Ortega*, 2014-NMSC-017, ¶ 23, 327 P.3d 1076

34

("Kidnapping may occur once the [v]ictim's physical association with [the d]efendant [is] no longer voluntary." (alterations in original) (internal quotation marks and citation omitted)). And the jury verdict for kidnapping was supported by substantial evidence. The State presented evidence that Defendant placed the unconscious Lambert in a vehicle and transported her from the Stevens Inn to the location on Potash Mines Road 11.7 miles away where he proceeded to beat her with an air pump, drag her behind a barn by tying one end of rope to her neck and the other to the vehicle, and then hit her repeatedly with a "bar." The State presented medical testimony that Lambert was still alive when Defendant transported her from the hotel to the Potash Mines Road property. The State's medical expert also testified that Lambert was still alive when she incurred injuries consistent with the cause of her death, blunt trauma and ligature strangulation. We conclude there was sufficient evidence at trial to support Defendant's kidnapping conviction.

**3.      Sufficient evidence supports Defendant's conviction for tampering with evidence**

{52}      Defendant appeals his conviction for tampering with evidence under NMSA 1978, Section 30-22-5 (2003), arguing that there was insufficient evidence to support his conviction on this charge. The State had to prove the following elements beyond a reasonable doubt to convict Defendant of tampering with the evidence:

35

1. [D]efendant placed the pump or rope;

2. [By doing so, D]efendant intended to prevent the apprehension, prosecution or conviction of himself for murder;

3. [D]efendant was not intoxicated from the use of alcohol at the time the offense was committed to the extent of being incapable of forming an intention to prevent the apprehension, prosecution or conviction of himself for murder.

4. This happened in New Mexico on or about March 2, 2014.

*See* § 30-22-5(A); UJI 14-2241 NMRA.

{53} "Tampering with evidence is a specific intent crime," and the State must present "sufficient evidence from which the jury can infer that the defendant acted with an intent to prevent 'apprehension, prosecution, or conviction of any person or to throw suspicion of the commission of a crime upon another.'" *State v. Silva*, 2008-NMSC-051, ¶ 18, 144 N.M. 815, 192 P.3d 1192 (quoting § 30-22-5(A)). "When there is no other evidence of the specific intent of the defendant to disrupt the police investigation, intent is often inferred from an overt act of the defendant." *Duran*, 2006-NMSC-035, ¶ 14.

{54} In this case, there is sufficient evidence from which a reasonable jury could conclude that Defendant placed the air pump and rope in locations outside of Carlsbad, New Mexico, with the intent to prevent his own prosecution, apprehension, or conviction. Defendant, by his own admission, sought to "cover [his] tracks" by

36

locating the rope and throwing it on the side of the road, disposing of his bloody pants in a gas station dumpster, wiping blood off the hotel room walls, and throwing away Lambert's dress. Defendant further admitted that he threw the "bar" off to the side of the road when leaving the scene of the homicide. Defendant described to officers how he disposed of the evidence, and he led officers to the locations where he had placed the rope, a bag with Lambert's clothing, and the air pump. Accordingly, we affirm Defendant's tampering conviction.

## H.    Cumulative Error

{55}    Finally, Defendant contends his convictions should be reversed because errors raised in this case "accumulate[d] to the point of rendering the verdict inherently unreliable." "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. "The cumulative error doctrine is strictly applied and may not be successfully invoked if the record as a whole demonstrates the defendant received a fair trial." *State v. Guerra*, 2012-NMSC-014, ¶ 47, 278 P.3d 1031 (internal quotation marks and citation omitted). We conclude that Defendant received a fair trial, and we have determined that there was no error. "[W]here there is no error to accumulate, there can be no cumulative error." *State v. Samora*, 2013-NMSC-038, ¶

37

28, 307 P.3d 328 (internal quotation marks and citation omitted). Accordingly, Defendant's cumulative error claim is meritless.

## III.    CONCLUSION

{56}    We hold that Defendant's claims lack merit and affirm Defendant's convictions for first-degree murder, kidnapping, and tampering with the evidence.

{57}    **IT IS SO ORDERED.**


_____
**CHARLES W. DANIELS, Chief Justice**

**WE CONCUR:**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**BARBARA J. VIGIL, Justice**


_____

38

**JUDITH K. NAKAMURA, Justice**

39